TEXAS ELECTRIC RY. v. STEWART et al.
(No. 8299.)

(Court of Civil Appeals of Texas. Dallas. Dec. 20, 1919. On Motion for Rehearing, Jan. 17, 1920.)

1. CARRIERS ☞318(8)—EVIDENCE SUSTAINED FINDING OF NEGLIGENCE IN ACTION FOR DEATH OF PASSENGER STRUCK IN ATTEMPTING TO BOARD CAR.

Where the employé of an interurban railroad company, having transportation, after leaving defendant's ticket office, where he had gone to wait for the car, when crossing the track to a platform from which to board the approaching car, was killed by it, evidence that the car was running about 40 miles an hour, on a dark and stormy night, when the motorman might have anticipated that some one might be crossing the track to board the car, which was to stop on signal only, held to sustain a finding of negligence proximately causing the employé's death.

2. CARRIERS ☞287(1)—ABSENCE OF STATUTORY REGULATION OF SPEED OF INTERURBAN CAR HELD IMMATERIAL IN ACTION FOR DEATH OF PASSENGER.

Where defendant's employé, having transportation, was killed by one of defendant's interurban cars while crossing the track to board the same, the absence of statute or ordinance regulating the speed of defendant's cars while passing the station was immaterial, the operatives of the car owing the duty of using ordinary care to discover and avoid injuring persons who might be expected to be at the station.

3. APPEAL AND ERROR ☞930(3)—FINDINGS OF TRIAL COURT AS TO NEGLIGENCE PRESUMED WHERE JURY FOUND A NEGLIGENT ACT ON SPECIAL ISSUE.

Where defendant's employé was killed by an interurban car while crossing the track to board it, and the jury found on special issue that defendant's operatives in charge of the car did not have it under control, it will be presumed on appeal that the trial court found that defendant's servants were negligent in approaching and passing the station at a high and dangerous rate of speed, and that such negligence was the proximate cause of the employé's death, no special issue as to negligence having been submitted.

4. CARRIERS ☞320(10)—NEGLIGENCE IN APPROACHING STATION QUESTION FOR JURY.

Whether carrier was negligent in operating car at high rate of speed approaching station where passengers buying tickets had to cross tracks to board car, held, under the circumstances and evidence, for the jury.

5. CARRIERS ☞347(3)—SERVANT WITH TRANSPORTATION KILLED WHILE CROSSING TRACK NOT GUILTY OF CONTRIBUTORY NEGLIGENCE AS MATTER OF LAW.

In an action for the death of an employé of defendant killed by defendant's interurban car while crossing the track from the ticket office, where he had gone to wait for the car, although he had transportation, and going to a platform on the opposite side, preparatory to boarding an approaching car, on a dark and stormy night, evidence held not to show that decedent was guilty of contributory negligence as a matter of law.

6. CARRIERS ☞318(2)—EVIDENCE SUSTAINING FINDING OF NEGLIGENCE IN LEAVING GANGPLANK ON PLATFORM WHICH CAUSED THE FALL OF PASSENGER ATTEMPTING TO BOARD CAR.

Where a passenger was struck by defendant's interurban car and killed while crossing from the ticket office to a platform on the opposite side of the track by stumbling against a gangplank lying on the platform, a finding that defendant was guilty of negligence in leaving the gangplank in such a position held justified by the evidence.

7. TRIAL ☞219—REFUSAL TO DEFINE WORD "CONTROL" IN INSTRUCTION IN ACTION FOR DEATH OF PASSENGER WAS NOT ERRONEOUS.

In an action for the death of a passenger struck by defendant's interurban car while crossing the track to board the car, and it appeared that the car passed the station at a high rate of speed, it was not error to refuse to define the word "control" as applied to the operation of the car by defendant's employés.

8. TRIAL ☞194(18)—INSTRUCTION IN ACTION FOR DEATH OF PASSENGER PROPERLY REFUSED AS ON WEIGHT OF EVIDENCE.

In an action for death of a passenger struck by a rapidly moving car while crossing the track to board it, an instruction to defendant's authority to run the car upon its track held properly refused, as being on the weight of the evidence.

9. CARRIERS ☞348(3)—INSTRUCTION IN ACTION FOR DEATH OF PASSENGER PROPERLY REFUSED AS MISLEADING.

In an action for the death of a passenger struck by defendant's car while crossing the track to board it, an instruction as to decedent's duty to look and listen for the approaching car was properly refused as being misleading.

10. DEATH ☞91—REMARRIAGE OF WIDOW NOT TO BE CONSIDERED IN MITIGATION OF DAMAGES.

In a wife's action for the death of her husband it was not error to charge that the jury should not consider in mitigation of damages the fact of her remarriage, inadmissible evidence as to such remarriage, introduced by defendant, having been admitted.

11. DEATH ☞99(1)—$4,800 DAMAGES FOR DEATH OF MAN 23 YEARS OLD NOT EXCESSIVE.

$2,400 to the widow and $2,400 to the father and mother held not excessive damages for the death of a strong healthy man 23 years old.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by Julia Stewart and others against the Texas Electric Railway for wrongful death of H. E. Stewart. Judgment for plaintiffs, and defendant appeals. Affirmed.

Templeton, Beall, Williams & Callaway, of Dallas, for appellant.

Spence, Haven & Smithdeal, of Dallas, for appellees.

TALBOT, J. The appellees, Mrs. Julia Stewart, as surviving wife, W. R. Stewart and Beatrice Stewart, as the surviving father and mother, respectively, sued the appellant on June 7, 1918, to recover damages suffered by reason of the death of H. E. Stewart, which they allege was caused by the negligence of the appellant on the 27th day of February, 1918, at Lisbon, a station on appellant's line of road, in Dallas county, Tex. The appellee Mrs. Julia Stewart married Charlie Carter after the death of Stewart and before the trial, and he was made a party pro forma to the suit. The material facts upon which the appellees base their right to recover, as set forth in the petition and which are supported by the evidence, may be stated as follows:

The appellees W. R. Stewart and Beatrice Stewart were the father and mother, respectively, of H. E. Stewart, and on the 27th day of February, 1918, H. E. Stewart and appellee Julia Stewart were husband and wife. On said date H. E. Stewart went to the appellant's station at Lisbon, which was a flag station, in Dallas county, Tex., for the purpose of taking passage on one of appellant's interurban cars at said station for Oak Cliff, in said county. The appellant had a station house at Lisbon, and its schedule of cars showed that the car reaching Lisbon at 7:43 p. m., bound for Oak Cliff and the city of Dallas, stopped there when flagged for the purpose of taking on passengers. A. E. Wilson was appellant's ticket agent at this station, and had been, when the accident in question occurred, about five years. The appellant furnished this agent tickets, a ticket case, and flags and lanterns, and the ticket office or place where tickets were sold was maintained in its agent's storehouse, with the following sign on the house: "Interurban Ticket and Express Office." This was the only ticket office at the station. The appellant's track runs practically north and south at Lisbon, and its said ticket office there was on the opposite and east side of its railway track from the station on the west side at which passengers must board its cars, and the ticket office and station house were about 50 or 75 yards apart. It seems that the deceased was in appellant's employ, had transportation over its road, and did not purchase a ticket. Shortly after he went to appellant's ticket office, and while waiting there for the car he intended to take passage on, he was notified by appellant's agent that the 7:43 p. m. car was coming. Upon receiving this notice Stewart started from the ticket office toward the station to board the approaching car, and, in order to reach the station, he was compelled to cross the railway track. At this time there were no lights at the station, and it was with difficulty that any obstruction on the ground or platform adjacent to appellant's track could be seen, if at all. As the deceased proceeded in the direction of the station, and as he was crossing the railway track, Lonnie Gilmour, who was accompanying him, and who was also in the act of crossing the track with him for the purpose of taking passage on said car, signaled the motorman to stop the car. The motorman operating the car failed to stop the car, but, as is reasonably deducible from the testimony, drove the same past the station at the rate of about 35 or 40 miles an hour. It is true he said at one place in his testimony that when his car was within 30 or 35 feet of the deceased he saw him for the first time, and then put on the emergency brake, and that when the car struck the deceased it was running, he guessed, about 20 or 25 miles an hour; but at another place he said he was running 40 or 45 miles an hour as he approached the station, and only reduced the speed before reaching it, "just a little, possibly 5 or 6 miles an hour," and that when he reached the station he "must have been making 35 or 40 miles an hour." He further testified that he knew, if he was running 30 or 35 miles an hour up to within 30 feet of the deceased, it took the car less than a second after he saw him before it struck him. The night was dark and very cold; the waiting room at the station where the passengers were compelled to board appellant's cars was not lighted, and was very cold and disagreeable. The office of appellant's agent on the opposite side of the railway track from the station, where he sold tickets to persons intending to take passage on appellant's cars at Lisbon, was provided with a fire, and kept warm and comfortable by said agent for the accommodation of passengers. It was customary for passengers, especially in the winter months, to go to the ticket office. The agents of appellant operating the car in question knew, or by the exercise of ordinary care should have known, that persons who were seeking to take passage on appellant's car that passed the station at Lisbon at 7:43 p. m. would go to the ticket office provided by appellant at that place, and there remain protected from the cold until the car approached the station, and then walk across the railway track to the station, and there board the car they desired to take. Appellant received and discharged passengers

only from the side of the car towards the depot or station house and not from the side of the car, towards the ticket office. There was no ticket office maintained in the depot or station house. The station was not directly opposite, but was a little northwest of the ticket office. There was a gangplank used by appellant for unloading packages from its cars onto its platform, lying, at the time the deceased was injured, between the freight platform of the station and the appellant's railway tracks on the gravel platform provided for the use of passengers in boarding appellant's cars. This gangplank was about 35 inches wide and 6 feet long. Setting on the gravel platform the ends are 2⅛ inches above the platform. The deceased, in attempting to cross appellant's track to the station for the purpose of boarding the approaching car to be transported to Oak Cliff, either struck his foot against the gangplank lying on the platform, which threw or caused him to fall against the approaching car, or was struck by said car before he cleared the track, and so badly injured that as a result thereof he died a few hours thereafter. Other facts will be disclosed in the discussion of questions raised for our decision.

The appellant pleaded general and special demurrers, a general denial, and specially that the deceased was one of its employés; that he resided at Lisbon, rode its cars daily, and knew they would stop there for the purpose of receiving passengers only upon signals duly given; that the deceased actually knew the car in question was approaching, and, in total disregard of his own safety, he negligently went upon appellant's railway track in front of said car, and only a few feet therefrom, and at such time and place and in such manner as to render it wholly impossible for appellant's motorman to stop the car or to reduce the speed thereof and thereby avoid striking him; hence he was guilty of contributory negligence. The trial court refused to instruct the jury to return a verdict in appellant's favor, and submitted the case upon special issues. Upon the findings of the jury judgment was rendered in favor of appellees. From this judgment appellant appealed.

The first contention is, in substance, that the court erred in refusing to direct the jury, as requested by appellant, to return a verdict for appellant, because the evidence was wholly insufficient to show actionable negligence on the part of the appellant in any respect, and wholly failed to establish the negligence alleged against it. If this is a correct statement with respect to the evidence, the jury should have been peremptorily instructed to return a verdict in favor of the appellant, and the judgment of the district court must be reversed. The appellees charged, among other grounds of negligence alleged, that appellant was guilty of negligence (1) in maintaining its station and place of boarding cars on the opposite sides of its railway track from its ticket office, thereby requiring passengers to cross the track to buy tickets, and then recross same to board the cars, and in operating the car the deceased desired to board past the station of Lisbon without having said car under control, to the end that it could be stopped before striking passengers who were coming from appellant's ticket office to the station for the purpose of boarding said car; (2) in having a gangplank on the platform of its station at Lisbon; (3) in operating said car in approaching and passing said station at a high and dangerous rate of speed. The jury answered, in response to appropriate interrogatories, that appellant's servants operating the car which struck the deceased failed to have said car under control in approaching and passing said station, and that such failure was negligence on the part of appellant's servants and the proximate cause of the deceased's death; (3) that appellant was guilty of negligence in having on its platform at Lisbon a gangplank, and that such negligence was also a proximate cause of the death of the deceased. The issue of whether the appellant's agents in charge of the car were guilty of negligence proximately causing the injuries and death of the deceased in operating the car at a high and dangerous rate of speed as they approached and passed the station was not specifically submitted to the jury. However, the questions whether or not the servants of the appellant operating the car which struck the deceased negligently failed to have said car under control in approaching and passing the station, and whether or not such failure was the proximate cause or the death of the deceased, were submitted, and both answered in the affirmative. Did the evidence justify such answers? We have reached the conclusion it did. The uncontroverted evidence shows that appellant maintained at Lisbon a depot and gravel platform, located on the west side of its railway track, and a ticket office or place where its agent sold railway tickets, located on the east side of its track. This depot and office were about 75 yards apart. In order to secure a ticket at this point for transportation over appellant's line of road it was necessary to go to the ticket office, purchase a ticket, and then walk 75 yards in a northwesterly direction across the railway track to the gravel platform in order to board the car. No lights were maintained at this depot, and no means provided for heating it. At its said ticket office, or place where tickets were sold to persons intending to take passage on its cars, a fire and lights were usually kept, and it was a comfortable place for passengers to wait for the arrival of cars. There were several hundred inhabitants living in the immediate neighborhood of this station, though distant a few hundred yards from the village of Lisbon, and

the receipts for sales of railway tickets amounted to about the sum of $200 per month. It had been customary, for a period of four or five years prior to the accident in question, especially during the winter months, for persons desiring to become passengers upon appellant's cars, whether they did or did not buy tickets, to go to the ticket office referred to, and remain there until the car they intended to board was heard approaching, and then cross the track to the depot platform. The agents and employés of appellant knew of this custom long prior to the time the deceased was killed. On the night the deceased met his death a sandstorm was raging and it was very dark. These facts were known to the servants of appellant in charge of and operating said car which struck the deceased and caused his death. There were no lights at the depot, and the vision of the motorman who operated the car was restricted to objects which would come within the light given from the headlight of the car. The evidence further showed without dispute that the light from the headlight of the car would shine about 5 feet on each side of the railway track when the car was 1,000 feet from the depot at Lisbon, and 2 or 3 feet on each side of the track when the car was 500 feet from the depot. From this it is evident that a motorman operating one of appellant's cars at night, in approaching the depot at Lisbon, could not see a person intending to take passage on the car coming from the ticket office to the depot, if his car was 1,000 feet from the depot, until such person had approached to within about 5 or 6 feet of the railway track, or within about 2 or 3 feet of the track, if his car was 500 feet from the depot. The motorman, notwithstanding these facts, which were known to him, approached the depot running the car, according to his own testimony, as fast as the electric current could propel it, which was at least 40 or 45 miles per hour, and regardless of whether or not passengers might be in the act of crossing the track from the ticket office to the depot.

[1] So that it is clear from the record sent to this court that we would not be authorized to say there was no evidence of negligence on the part of appellant's servants operating the car in question which proximately caused the death of the deceased.

[2] The fact that there was no statute in the state and no ordinance in the town of Lisbon regulating the speed at which appellant's cars could pass the station where the accident in question occurred does not materially affect the question; for whether or not appellant was guilty of negligence in the manner in which it operated the car that came in contact with the deceased, there being no statute regulating its speed, was a question to be determined by the jury in the light of the conditions and circumstances surrounding the station at the time of the ac-

cident. The degree of care imposed by law upon the operatives of the car was ordinary care to discover and avoid injuring persons who might be expected to be at the station, and in exercising that degree of care they must use such vigilance and caution as a person of ordinary prudence under like circumstances would use. Railway Co. v. Smith, 87 Tex. 348, 28 S. W. 520. The Supreme Court of this state has several times held that "a railroad company is guilty of actionable negligence in failing to exercise ordinary care to discover and avoid injuring persons upon the track at such places and upon such occasions as one of ordinary prudence would expect to find them; and whether such persons are trespassers or rightfully upon the track makes no difference in the determination of the issue of the company's negligence in that respect, considered separately and apart from issues of contributory negligence of the person injured." Railway Co. v. Watkins, 88 Tex. 20, 29 S. W. 232; Railway Co. v. Malone, 102 Tex. 269, 115 S. W. 1158; Railway Co. v. Shiflet, 98 Tex. 326, 83 S. W. 677; Railway Co. v. West, 174 S. W. 287. See, also, the opinion of this court in Railway Co. v. Douthit, 208 S. W. 201.

[3] The submission of the issue in this case of whether or not the operatives of the car which struck the deceased had said car under control in approaching and passing appellant's station at Lisbon was evidently suggested by, and predicated upon, the testimony relating to the speed at which said car was being propelled, and the circumstances surrounding the station, and the finding of the jury that they did not was likewise based upon such testimony, and, if necessary in support of the judgment rendered, since the evidence would warrant such findings, and since such issue was not submitted to the jury and no request made therefor, it must be presumed on this appeal that the trial court found that appellant's servants were guilty of negligence in that they operated the car that struck the deceased, in approaching and passing the station of Lisbon at a high and dangerous rate of speed, and that such negligence was the proximate cause of the death of the deceased. It is true the speed of the car, in the absence of statutory regulation, could not be regarded as negligence per se, but in approaching and passing such a station as the evidence shows the station of Lisbon to be, although it was a flag station, appellant had no right, regardless of the danger to persons there for the purpose of taking passage on its cars, to operate its cars at such speed as they saw proper. At such a station, there being no statute regulating the speed at which the cars could be run, negligence may be evidenced by the speed at which the car is being propelled, when considered "in connection with the place of the accident and the circumstances surrounding it." Neither the case of McDonald v. Railway

Co., 86 Tex. 4, 22 S. W. 939, 40 Am. St. Rep. 803, nor Railway Co. v. Langham, 95 S. W. 686, nor either of the other cases cited by appellant, announce a contrary rule. On the contrary, the rule we have stated is clearly recognized in the two cases named.

[4] In view of the principle of law announced and the evidence disclosed by the record, it must be held that whether or not, under the surrounding conditions and circumstances at the station of Lisbon, the appellant exercised such care and vigilance as a prudent person would have exercised under like conditions to avoid striking and injuring the deceased, was a question for the determination of the jury. As urged by appellee, the motorman operating appellant's car could anticipate that a passenger or passengers would be coming from the ticket office to the depot platform. He knew, as shown by his own testimony, that when his car was 500 feet from the depot he could not see them until they were within 2 or 3 feet of the railway track. He knew that he was running the car operated by him from 35 to 40 miles an hour, and that he could not stop it in less than about 600 feet. He knew that it was a dark and stormy night, and that especially on such nights passengers, whether they bought tickets or not, waited in the ticket office, and crossed the railway track to board the car at the depot. With this knowledge he ran the car, as before stated, at the speed of 35 or 40 miles an hour past the depot. How then can it reasonably be said, as a matter of law, that the evidence wholly failed to establish culpable negligence on appellant's part, and the case should have been taken from the jury? The fact that the motorman, when he discovered the peril of the deceased, did all in his power to avoid striking him does not answer this question.

[5] The next contention of the appellant is that the trial court erred in refusing its peremptory instruction directing the jury to return a verdict in its favor, and in submitting any issue of fact whatever to the jury, because the undisputed evidence showed that the deceased was guilty of contributory negligence as a matter of law barring a recovery. To this view of the evidence we are unable to agree. The material testimony bearing upon the issue has already been stated and need not be repeated. It is not, however, in our opinion, of such a character "that there is no room for ordinary minds to differ as to the conclusion to be drawn from it"; and unless it was of such character the issue of contributory negligence on the part of the deceased was not one of law, but one of fact for the determination of the jury. In Railway Co. v. Wagley, 15 Tex. Civ. App. 308, 40 S. W. 538, this court said that the statement of the rule, and the one easiest to comprehend and apply, is that given in Railroad Co. v. Ives, 144 U. S. 417, 12 Sup. Ct. 683, 36 L. Ed. 485, namely:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the courts."

It has been more than once held in this state that a person at the depot of a railway company, who endeavors to cross the track in front of an approaching train, is not guilty of contributory negligence, as a matter of law. Railway Co. v. Wagley, supra; Railway Co. v. Laskowski, 47 S. W. 59.

[6] The jury, in response to appropriate questions, found that appellant was guilty of negligence in leaving a gangplank on its platform at the station Lisbon, and that such negligence proximately caused the injuries to, and death of, the deceased. The appellant complains of the submission of these issues on the ground that the evidence was insufficient to raise such issues. On the other hand, the appellees assert that the evidence was amply sufficient to raise the issues and to sustain the findings of the jury upon them. We have carefully examined the testimony, and feel constrained to hold with the contention of the appellees. It is undisputed that on the night the deceased was injured a gangplank was lying on the gravel platform used by passengers in boarding and alighting from appellant's cars at its station Lisbon. This gangplank was about 3 feet wide and 6 feet long, with its ends beveled, and so constructed that, regardless of how it was located on the platform, its ends would be approximately 2 inches above the platform, so that a passenger attempting to board one of appellant's cars at night, there being no lights maintained there, might strike his foot against and stumble over it. The gangplank at the time the deceased was injured was lying, according to the testimony of several witnesses, from 6 to 9 feet north of the passenger depot door. The gravel platform between the station house and the west rail of the railway track was about 6 feet wide, and the gangplank was lying near the center of the platform and parallel, or nearly so, with the track. The deceased after the accident was found lying on the platform with his head within a few inches of the west rail of the track, and his feet about 2 or 3 feet from the gangplank. The witness Lonnie Gilmour testified to the effect that when he crossed the railway track in front of the approaching car he came upon the gravel platform in front of the door of the passenger depot, and that the deceased came upon the platform from 3 to 5 feet north of that door. The car was approaching from the south, running

north on practically a straight track. The deceased was approaching the depot from the ticket office, going possibly a little north of. west. When he went upon the railway track his left side was toward the approaching car, and the undisputed testimony ·shows that the only injuries he received were upon the right side of his body. The right side of his head had quite a cut on it, and his right foot was broken at the ankle. As we understand and construe the evidence, there was really no eyewitness to the immediate cause of the injuries which were inflicted upon him, and whether he was struck by the car before he cleared the railway track, or whether he cleared the track, struck his foot against the gangplank, and was thereby caused to fall against the rapidly moving car, were problems depending upon circumstantial evidence for solution. Negligence on the part of the appellant in having the gangplank on the platform was one of the grounds of negligence alleged, and it was not incumbent upon appellees to show such negligence by direct and positive evidence. The establishment of facts and circumstances from which it could reasonably be inferred was sufficient. "In other words, a verdict for negligence may be supported by inference, but such inference must be a logical, probable, and reasonable deduction from proved or conceded facts. Negligence cannot be a mere matter of conjecture, but must be fairly inferable from the. evidence. This principle permits the admission of circumstantial evidence to contradict positive and direct testimony." Railway Co. v. Boone, 105 Tex. 188, 146 S. W. 533.

In the light of all the facts, we are not prepared to say that the jury's findings that appellant was guilty of negligence in having the gangplank on the platform, and that such negligence proximately caused the injuries and death of the deceased, is without evidence to support them. It is clear that if the deceased was going west or northwest in. crossing appellant's railway track, as the testimony shows he was, and was struck by the car going north before he cleared the track, the wounds thereby inflicted upon him would have been on his left side, and not on his right side. If, however, he had gotten upon the gravel platform, and struck his foot against the gangplank lying on the platform, or stepped on the bevel end of the gangplank, and thereby caused to lose his equilibrium and fall, which is not an unreasonable deduction from the facts and circumstances shown, it is probable that his right side would have fallen against the moving car, and that side of his body injured as the testimony shows it was. True, it is possible he may have turned .his right side toward the approaching car, when he realized its dangerous proximity to him, in an effort to retrace his steps, but that he did so

is unlikely, or no more to be inferred from the established facts and circumstances than that he cleared the track and was caused to fall against or into the car by coming in contact with the gangplank. Indeed, Lonnie Gilmour testified, in substance, that the last time he saw the deceased while he was on the track the deceased seemed to be in the act of stepping over the west rail onto the platform. At any rate, from all the evidence it was for the jury to determine, it occurs to us, whether or not the deceased had crossed the track, struck his foot against the gangplank, and thereby caused to fall into the fast moving car. As additional authority illustrative of the rule that should apply with reference to the sufficiency of the evidence to raise the issue in question, we cite the case of Bock v. Fellman Dry Goods Co., 212 S. W. 635; and as said in that case we say here, that we do not wish to be understood as holding that a preponderance of the evidence tends to show either that the appellant was guilty of negligence in allowing the gangplank to be upon its platform, or that such negligence was the proximate cause of the accident resulting in the death of the deceased, but merely that the evidence was sufficient to require the submission of those issues. to the jury for their determination. See, also, Railway Co. v. Boone, 105 Tex. 188, 146 S. W. 533; Railway Co. v. Vallejo, 102 Tex. 73, 113 S. W. 4, 115 S. W. 25; Railway Co. v. Geron, 162 S. W. 471. In the last case cited the plaintiff claimed that in attempting to board a stock car his foot hit an obstruction which threw him "out of balance" and he fell against the car. In passing upon the sufficiency of the evidence to raise the question of negligence on the part of the railway company in having the obstruction on the ground near its track, the court, among other things, said:

"Thus by giving force to all the testimony it is believed that the facts and circumstances reasonably point to a clinker as the obstacle that the appellee's left foot struck, causing him to lose his balance, and the court did not err in passing the question to the jury."

[7] The court committed no error, we think, in refusing to give in charge to the jury appellant's requested instruction defining the word "control" as used in issues submitted. The word as used had no such technical meaning as required an explanation of its significance to the jury to the end that they be not misled by its use. Besides, the court charged the jury that it was the duty of the motorman operating the car at the time and place in question to operate the same with such reasonable and ordinary care and circumspection as a person of ordinary prudence would have done under the same or similar circumstances, and in answering the special issues in which the word control appeared, or upon which the jury's answer

depended, they must be guided by said instruction.

The appellant requested the trial court to charge the jury, in substance, that it was authorized by law to run the car upon its track at the time and place in question, and the law did not impose any rule as to the rate of speed for such car; that its agents in charge of said car had the right to act upon the presumption that the right of way for the car would be respected by persons approaching the track. But that it was the duty of its agents operating the car to operate the same with ordinary care to avoid inflicting injury upon other persons. In this connection, and as a part of said requested charge, they were further told that it was the duty of the deceased in approaching appellant's track, and in going upon said track, to exercise ordinary care for his own safety, and to look out and use the senses of which he was capable to ascertain whether or not there was danger from the approaching car before attempting to cross the track, and, if he failed to do so, he would be guilty of contributory negligence.

[8] We think there was no error in refusing this charge for at least two reasons: First, because, while it is true there was no statute or ordinance regulating the rate of speed at which appellant was authorized to operate its cars past the station of Lisbon, it would have been upon the weight of the evidence in this case and error to have instructed the jury that the appellant was authorized by law to run its cars upon its track at the time and place in question at any rate of speed it saw fit, because the circumstances surrounding the station, etc., demanded that the cars of appellant should be run with such care and circumspection and at such rate of speed as not to endanger the lives of persons going from appellant's ticket office to the depot to board the car. The effect of that portion of the charge here referred to was to tell the jury that since there was no statute or ordinance regulating the speed at which appellant was authorized to run its cars past the station, it could do so at any rate of speed it desired, without incurring liability for injuries inflicted upon persons at the station as a result of the speed at which the car was being propelled. At least the charge was so framed in this particular as to create the belief in the minds of the jurors trying the case that such was appellant's right, and would have been confusing and misleading.

[9] Second, the charge in the latter clause thereof, properly construed and analyzed, not only told the jury that it was the duty of the deceased, in approaching and going upon the appellant's track, to exercise ordinary care for his own safety, but in addition thereto to look out and use the senses of which he was capable—that is, to look and listen for the approaching car—to the end that he might thereby ascertain whether or not there was danger from it in going upon the track, and that if he failed to so look out and use his sense of hearing he was guilty of contributory negligence which would bar a recovery. The effect of the charge, as will be noticed, was not to instruct the jury that if the deceased failed to use ordinary care in looking and listening for the approaching car, and such failure proximately caused his injury and death, he was guilty of contributory negligence, but, in effect, instructed them, as stated, that it was his duty to exercise ordinary care for his own safety (which was correct), and to look out and use his senses to ascertain whether or not there was danger from the approaching car before going upon the track, and thereby avoid injury to himself, and that if he neglected to so look and exercise his senses he would be guilty of contributory negligence as a matter of law, and appellees could not recover. As arranged and worded, the charge would, at any rate, have conveyed to the jury an erroneous idea of the law upon the subject, and misled them, very likely, to the prejudice of the appellees. That the failure to look and listen before going upon or crossing a railway track at such place as the one here in question is not negligence as a matter of law, has been so often declared by decisions of this state, and is so well understood that authority in support of the proposition need not be cited. We have examined the several cases cited by appellant in support of its contention that the court erred in refusing to give the special charge under consideration, but failed to discover any expression in either of them which sustains the contention, or which indicates that we have reached an erroneous conclusion in regard thereto.

[10] The court at the request of appellees charged the jury that they should not consider, in mitigation of the damages which they might allow to the appellee Mrs. Julia Stewart Carter, the fact of her remarriage. The giving of this charge is assigned as error. The record discloses that the fact of this appellee's remarriage was shown by evidence introduced by appellant, and the court having admitted such testimony, which was, we think, inadmissible for the purpose for which it was evidently offered, the court did not err in giving the charge correcting the error committed in admitting it. We are aware of no case decided in this state in which the precise question was passed upon, but in consolidated Stone Co. v. Morgan, 160 Ind. 241, 66 N. E. 696, cited by appellees, the Supreme Court of Indiana said:

"Instruction No. 24 told the jury that the marriage of the widow of the decedent should not be considered by them in assessing the

damages, if damages should be given. There was no error in this."

[11] The jury found that the appellee Mrs. Julia Stewart Carter had sustained damages in the sum of $2,400 on account of the death of her husband, H. E. Stewart, and that the appellees W. R. Stewart and Mrs. Beatrice Stewart, father and mother, respectively, of the deceased, had sustained damages in a like sum on account of his death. Judgment was rendered in accordance with these findings, and appellant charges that the amount of said judgment, as to both Mrs. Julia Stewart Carter and W. R. and Mrs. Beatrice Stewart is grossly excessive, and shows that the findings of the jury were the result of bias in favor of the appellees and passion and prejudice against the appellant. There is nothing in the record which indicates that the jurors who tried the case were actuated by any improper motive in arriving at the amount of damages allowed, and we are not prepared to say that the facts upon which they estimated the damages suffered were not sufficient to justify the respective amounts awarded. The deceased was 23 years of age at the time of his death, and a strong, healthy young man. He had been raised on a farm. On account of the drouth in Northwest Texas, his father left Cottle county in March or April, 1917, and came to Lisbon to live. The deceased remained in Cottle county until December, 1917, but, on account of the continued drouth, he abandoned farming, came to Dallas county, and accepted employment with the Texas Electric Company. He and his wife then went to his father's and mother's house at Lisbon, where they lived. He contributed practically all of his earnings to the support of his wife, father, and mother, and his living with his father and mother at Lisbon seems to have been a permanent arrangement. Under the undisputed evidence, we would not be authorized to say that the verdict and judgment are excessive.

We have carefully considered all of appellant's assignments of error, with the conclusion reached that neither of them discloses reversible error.

The judgment is affirmed.

On Motion for Rehearing.

Referring to the condition of the weather on the night the deceased, Stewart, was killed, we said in our opinion: "The night was * * * very cold." The correctness of this conclusion is challenged in appellant's motion for a rehearing, and the statement made that there is no evidence to support it, but that the "undisputed evidence" shows the contrary. We conclude from a further examination of the testimony that neither the conclusion attacked nor the statement made in the motion for a rehearing is entirely accurate. No witness testified that the weather was "very cold," but the motorman, who was operating the car that the deceased came in contact with, testified: "It was pretty cold the evening of the accident, disagreeable, and wind blowing, and a sand storm." However, admitting that it was not very cold the night of the accident in question, that fact does not materially alter the case; for, independently thereof, the evidence was of such a character as to require the submission of the issues upon which appellant's liability depended and to justify the jury's finding upon them. The testimony bearing upon the issue of contributory negligence on the part of the deceased is sufficiently stated in the opinion, and fails to show such negligence as a matter of law.

Seeing no sufficient reason for changing the disposition we have made of the case, the motion for rehearing is overruled.