McDONOUGH BROTHERS, INC.,
Appellant,

v.

Shirley K. LEWIS et al., Appellees.

No. 14951.

Court of Civil Appeals of Texas,
San Antonio.

Feb. 10, 1971.

Rehearing Denied March 10, 1971.

John H. Wood, Jr., Beckmann, Stanard, Wood & Keene, San Antonio, for appellant.

L. Tonnett Byrd, Don L. Davis, Byrd, Davis, Eisenberg & Clark, Austin, Earle Cobb, Jr., San Antonio, for appellees.

BARROW, Chief Justice.

Appellant has perfected its appeal from the judgment entered on a jury verdict,

whereby appellees, the surviving widow, minor child and parents, recovered damages for the wrongful death of Alfred Earl Lewis on November 21, 1967. The parties will be referred to as in the trial court.

Lewis was employed by Gieson & Latson Construction Co., which was the contractor on a project for the Texas Highway Department to resurface the asphalt topping on Southeast Military Drive in San Antonio. Defendant was a material supplier on this job and furnished hot mix asphalt, which was delivered in its tractor-trailers and dumped to form a windrow in front of a laydown or topping machine operated by the employees of Gieson & Latson.

The procedure followed was that the topping machine scooped up the hot asphalt in the windrow and left a "mat" of asphalt the width of the lane being resurfaced. The asphalt was dumped under the direction of an employee of Gieson & Latson, known as a "dumper," and this man was in turn directed by a co-employee so as to keep the nine-ton capacity hopper on the topping machine uniformly full. The trucks loaded with asphalt would stop a hundred feet or so ahead of the windrow, and when their turn to dump came, the driver backed up to the proper position under the direction of the dumper. The trailer would be positioned relative to the existing windrow, according to the needs of the topping machine—if the material was running light, the trailer would back over the existing windrow; on the other hand, if the topping machine had too much material, the unit would be positioned in front of the windrow. The dumper, at the proper time, would push a lever on the left rear of the trailer, which opened the belly dump and permitted the hot asphalt mix to spill out and form a windrow as the truck moved forward. The truck driver was under the control of the dumper in positioning his unit, and instructed to move only on signal from the dumper. Furthermore, the uniform safety rule was that if the driver lost sight of the dumper, he must immediately stop.

Southeast Military Drive is a six-lane highway divided by an esplanade, and on this occasion, the center east-bound lane was being resurfaced. The outside or south lane had been resurfaced, but only the inside lane was open to regular traffic. The father of Lewis was foreman of the topping machine crew, although he was not present at the time of the accident. Lewis, as well as two of his brothers, worked on this crew. At the time of the accident, Lewis was working as "dumper," and a unit operated by David Uribe, in the scope of his employment for defendant, was being maneuvered into proper position to dump its load of asphalt. Although the accident occurred about 2:00 p. m., with quite a few people in the area, no witness actually saw Lewis at the time his body went under the trailer. However, his head was crushed between the right rear dual wheels of the tractor on the unit operated by Uribe, and witnesses saw his body actually being flipped beneath the wheels of the moving unit.

Joe Lewis, brother of deceased, was on the topping machine at the time of the accident and was directing the dumping operation. He testified that the topping machine was running too full, and he had signalled the dumper (deceased) to leave about a 25–30 foot gap in the windrow. After giving such a signal, he saw Earl, who was standing between the windrow and the open traffic lane, signal for the truck to back. Joe saw the truck stop short of the windrow and last saw Earl when the latter was standing behind the stopped truck, facing the topping machine, while waiting for the signal to commence dumping. Joe directed his attention for about a minute or a minute and a half to the topping machine, and when he turned back to the truck, he saw Earl's body flipping on the right rear wheels of the tractor. Pat Lewis, who was working on the back of the topping machine, testified that he saw Earl signal the truck to stop, and saw it stop about ·50 feet or so in front of the topping machine.

Sgt. Franklin, USAF, was proceeding east in the open traffic lane, and as he approached the trailer, he noticed something tumbling in the rear wheels of the *trailer*. As he got abeam of the trailer, he noticed it was a body that was tumbling near the middle of the trailer, so he pulled around in front of the truck and went to render assistance. Mr. Gonzalez, a highway department inspector, testified as a witness for defendant. His job was to check the temperature of the asphalt mix as it was delivered, and to give a receipt for the load to the truck driver. Gonzalez had been standing beside the dumper shortly before the accident, but had moved to the esplanade as the dumper signalled Uribe to back into position. Gonzalez' attention was next attracted towards the unit by a passing lady's signal and, on looking towards the truck, he saw Lewis's body being flipped in the right rear wheels of the *tractor*. He immediately shouted at Uribe to stop the truck.

Uribe testified that deceased signalled him to back up when the unit was about 70–100 feet from the end of the existing windrow. At this time, the deceased-dumper was standing between the windrow and the lane of moving traffic. He last saw deceased when the latter was on the left side and about 5 feet from the trailer.

Uribe testified that he was required to look in rear view mirrors on both sides of the cab, and thus the dumper was not constantly watched. He said that when he did not see deceased on the side of his unit, he immediately stopped. He denied that he had previously stopped the unit after once starting back to take his dumping position. Thus by his testimony, he had not reached such position when Lewis disappeared from sight and he stopped.

Although it asserts twenty-four assignments of error, defendant does not challenge the sufficiency of the evidence to support the jury findings that its employee, Uribe, committed six acts of negligence, each of which was a proximate cause of Lewis's death, or the failure of the jury to find that Lewis committed any of the three acts of contributory negligence charged against him.[1] Under its first eight points, defendant complains of improper jury argument by plaintiffs' counsel. Its ninth point asserts that liability insurance was improperly injected in the case by plaintiffs' voir dire examination of the jury panel. Five points complain of the charge of the court, and by six points it urges that evidence was improperly admitted or excluded. Jury misconduct is asserted in two points. Under defendant's twenty-third point, it urges that the trial

---

1. The jury found:
   1. Uribe was backing the unit at a time when he could not do so with safety.
   2. Such backing was a proximate cause of Lewis's death.
   3. Uribe was backing the unit at a time when he could not see his dumper.
   4. Such backing was negligence; and
   (5.) a proximate cause of Lewis's death.
   6. Uribe failed to keep a proper lookout for his dumper.
   7. Such failure was a proximate cause of Lewis's death.
   8. On the occasion in question, Uribe backed the unit beyond the point where he was supposed to dump.
   9. Such backing was negligence; and
   (10.) a proximate cause of Lewis's death.
   11. Uribe was backing the unit when he could not know what was behind him.
   12. Such backing was negligence; and
   (13.) a proximate cause of Lewis's death.
   14. Uribe was backing the unit at an excessive rate of speed under the circumstances.
   15. Such backing was a proximate cause of Lewis's death.
   16. Lewis did not fail to keep a proper lookout.
   18. Lewis did not fail to move away from the backing truck.
   21. Lewis did not place himself in the path of the truck at a time when it was backing in reverse.
   24. The occurrence in question was not the result of an unavoidable accident.
   25. The present reasonable cash value of the damages sustained by each of plaintiffs proximately resulting from death of Lewis:

   | | |
   |---|---|
   | Shirley K. Lewis (wife) | $120,000 |
   | Alfred Earl Lewis, Jr. (minor son) | 50,000 |
   | Charles S. Lewis (father) | 5,000 |
   | Janie Inez Lewis (mother) | 5,000 |

court erred in failing to grant a remittitur; and by its final point, defendant seeks a new trial by virtue of the cumulative effect of all errors.

■ Defendant's first four points complain of improper argument by plaintiffs' counsel in accusing defendant and its counsel of subornation of perjury, willful misrepresentations, bad faith, and of producing evidence in the form of a posed photograph. In opening the final summation, plaintiffs' lead counsel stated in part, "First, I would like to say now, in my opinion, we would have had a little different version from some of these witnesses had they been left alone. I say that in defense of the witness. I feel it is fair to them to say it to you, because that's what I feel. Mr. Uribe and Mr. Gonzalez, in particular. In my opinion, you would have heard—now, of course, here they were persuaded and compelled to testify differently here before you from what they have, and it was shown. Pressure applied in the right place does terrible things." Objection by defendant was sustained; however, plaintiffs' counsel apparently did not understand such action in that after thanking the court, he continued briefly in the same vein.

Neither Uribe nor Gonzalez was under the control of defendant, in that Gonzalez still worked for the Texas Highway Department, and Uribe was employed elsewhere. Nevertheless, Uribe testified on behalf of the defendant, and his testimony was undoubtedly subject to some comment and criticism by plaintiffs, in that it was shown that he had recently gone over his deposition with one of defendant's attorneys, and several changes had been made in the deposition. Gonzalez was called as a witness by defendant, and testified on direct examination that he was not sure the truck was still moving when he shouted a warning to Uribe. On cross-examination he admitted that he had correctly told plaintiffs' investigator that his shouted warning on seeing the body flipping in

the wheels had caused Uribe to stop. There was no evidence that the defendant or anyone else had put any pressure on him, and the trial court properly sustained defendant's objection to such argument.

Following this line of argument, plaintiffs' counsel stated that Defendant's Exhibit "A" shows their whole context of defense and said, "My friends this is a posed, fabricated photograph." Further comments were made in the same tenor, including the statement that he was ashamed to have a part of such a case. Such admittedly serious charge is based on a rather unusual background. On-the-scene photographs were taken of the accident area by three different photographers, and a total of 14 such photos were introduced into evidence. Photographers James and Oefinger made a business of taking on-the-scene photographs of accidents and selling them to litigants. Six photographs made by Oefinger, including "A," were introduced by defendant. Four photographs taken by James were introduced by plaintiff. Officer Toscano, a detective-investigator of the San Antonio Police Department, investigated this accident and took photographs and made measurements at the scene. Although Officer Toscano was called as a witness by defendant, four photos made by him were introduced by plaintiffs through Officer Johnston, who was stationed in the district at the time of the accident, and had arrived on the scene before the body was even removed.

There was no evidence offered to show which photographs were taken first, although it is apparent that those of James and Toscano were made at about the same time, because the police identification blackboard is visible in most of their shots. The body was removed before any photographs were made, but a bloody spot is visible on the roadway in photographs taken by all three persons. All photos show defendant's unit had backed completely over the windrow, in that the windrow is visible in front of the cab of the tractor.[2] This

2. The overall length of the unit is 45 feet.

physical evidence, which is apparent in all photographs, substantially corroborated plaintiffs' theory, and the testimony of the brothers of deceased, that the driver backed further than required. Nevertheless, defendant's counsel in argument vigorously challenged plaintiffs' attorney to discuss the photographs. Defendant's reliance on the photographs was based on the fact that limestone dust was shown on the roadway only behind the tractor at its final stopping place, thus apparently supporting Uribe's testimony that he had stopped only once. Furthermore, defendant urged that the appearance of the roadway in front of the tractor did not indicate that a body had been tumbled in the tackote, which was placed on the surface in front of the topping machine.

All photographs were introduced without objection and indeed with little identification, although defendant's "A" indicated that the topping machine was stopped some distance behind the stopped trailer, whereas the other photographs, and particularly plaintiffs' "1," indicates that the topping machine was relatively close. This discrepancy was seen and pointed out by plaintiffs' counsel at the time exhibit "A" was introduced. Nevertheless, there was no attempt by either party to explain whether the truck or the topping machine was moved forward before "A" was taken, or whether the discrepancy reflects a distorted camera angle. In view of the number of persons favorable to both parties present, such evidence should have been easily obtained; and the absence of such evidence can only be explained by the apparent lack of materiality of the distance between the trailer and topping machine. The important thing is that the entire unit was straddling the existing windrow.

Despite the absence of any evidence that the topping machine had been moved forward after Oefinger's pictures were taken, defendant's attorney, in his argument, stated unequivocally that the other photographs so indicated. In response to the challenge to discuss the photographs, and defendant's argument that the topping machine was moved, plaintiffs' attorney made the above quoted charge that exhibit "A" was posed, and backed up such argument by reference to the background landmarks in the various photographs. A studied examination of the photographs convinces us that serious argument can be made as to whether the discrepancy between "A" and "1" is caused by moving the truck or topping machine in the photographs, if either was moved. It goes without saying that the jury would be the proper forum to resolve such argument.

Defendant also complains that plaintiffs' counsel in final summation improperly advised the jury of the effect of its answers. Although this phase of the argument was sprinkled with an occasional "based on the evidence," plaintiffs' attorney stated that plaintiffs would not get a penny no matter how much was found in damages, unless the issues relating to the truck driver's conduct, Lewis's conduct and unavoidable accident were answered as he had suggested. These issues determine "whether the plaintiffs win a penny or not." Further, he suggested, defendant wanted them to find just one thing Lewis did that was the cause of the accident, or that it was an unavoidable accident. The jury was advised that if this was done, "they (the defense) would walk away from here laughing." At this point, defendant objected, the trial court properly sustained the objection and instructed the jury that as previously instructed, they were not to concern themselves with the effect of their answers.

The final complaint of improper jury argument relates to the complaint that plaintiffs' attorney had improperly urged the jury to apply the "Golden Rule" in deciding the case. The jury was reminded there was no fairer test to follow than to: "Do unto others as you would have them do unto you." Defendant's objection to same was overruled, whereupon plaintiffs' counsel continued, "And there is no fairer rule on God's earth." It is seen that plain-

tiffs' counsel did not improperly suggest the jury place themselves in the position of plaintiffs in applying the "Golden Rule." Cf. Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478 (Tex.1943); Southern Pacific Co. v. Hayes, 391 S.W.2d 463 (Tex. Civ.App.—Corpus Christi 1965, writ ref'd n. r. e.).

Rule 269(e), Texas Rules of Civil Procedure, provides in part: "Mere personal criticism by counsel upon each other shall be avoided, and when indulged in shall be promptly corrected as a contempt of court." Our courts have repeatedly condemned appeals to passion and prejudice by unwarranted charges of subornation of perjury, misrepresentation, lack of honor, or of crafty practices by opposing counsel in his conduct of the case. Home Insurance Co. v. Greene, Tex.Civ.App., 443 S.W.2d 326, aff. 453 S.W.2d 470 (Tex.1970); Howsley & Jacobs v. Kendall, 376 S.W.2d 562 (Tex. 1964); Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115 (Tex.1951); Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302 (Tex. Comm'n.App.1941, opinion adopted); Phoenix Insurance Co. v. Thomas, 420 S.W.2d 431 (Tex.Civ.App.—Beaumont 1967, writ ref'd n. r. e.); Cross v. Houston Belt & Term. Ry. Co., 351 S.W.2d 84 (Tex.Civ. App.—Houston 1961, writ ref'd n. r. e.). Such charges go to the heart of our adversary system, and do irreparable harm when this system is under strong attack from many quarters.

There is nothing in this record which would support a claim that counsel for defense suborned perjury through the witnesses Uribe or Gonzalez. Nor does plaintiffs' counsel now suggest that counsel for defendant deliberately attempted to perpetuate a fraud on the court by a posed photograph. Plaintiffs' counsel was clearly justified in arguing that the testimony of Uribe was contrary to the physical facts and the other witnesses. However, Uribe had maintained this version from the time of accident. The testimony of Gonzalez was substantially the same as all other witnesses.

Defendant invited comment on the discrepancy between exhibit "A" and the other photographs, insofar as the location of the topping machine is concerned. It is regretable that in doing so, plaintiffs' counsel resorted to such intemperate language. However, reversible error is not shown by these comments, particularly in view of the immateriality of such discrepancy.

■ A more difficult question is presented by the comments as to the effect of the jury's answers. The fundamental concept of our special issue practice is that the jury does not decide for or against either party, but simply determines the material fact issues. Rule 226a., T.R.C.P., provides in part that the jury be given written instruction at the outset of its service, wherein each juror is advised in part: "You will not be asked, and you should not consider, whether one party or the other should win." This Rule further requires that each Charge of the Court contain an instruction similar to that given here: "You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers."

In Missouri Pacific Railroad Co. v. Goodson, 345 S.W.2d 569 (Tex.Civ.App.— San Antonio 1961, writ ref'd n. r. e.), this Court set forth the applicable rule as follows: "It is well settled that counsel may in argument suggest how special issues should be answered, and may even 'urge and beg' the jury to so answer them, provided the argument does not inform the jury of the effect the answers will have upon the judgment to be rendered." See also Texas & N. O. R. Co. v. McGinnis, 130 Tex. 338, 109 S.W.2d 160 (Tex.Comm'n. App.1937, opinion adopted); Arando v. Higgins, 220 S.W.2d 291 (Tex.Civ.App.— El Paso 1949, writ ref'd n. r. e.). Counsel for both parties grouped and argued the issues as pertaining to the conduct of Uribe and deceased. However, plaintiffs' counsel went beyond the permissible bounds of this type argument when he advised that wheth-

er plaintiffs received a penny depended on answering all issues as he had suggested. Further, that a single issue to the contrary would result in the defense "walking away from here laughing." It is seen that the trial court promptly sustained defendant's objection and voluntarily instructed the jury not to consider the effect of their decisions. Although there is some authority to the contrary,[3] we believe such an instruction is meaningful and the error culpable. Younger Brothers, Inc. v. Myers, 159 Tex. 585, 324 S.W.2d 546 (Tex.1959); Missouri Pacific Railroad Co. v. Goodson, 345 S.W.2d 569, supra.

In Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596 (Tex. 1953), the Supreme Court applied the doctrine of "harmless error" as set forth in Rules 434 and 503, T.R.C.P., to improper jury argument unless such argument was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. Otis Elevator Company v. Wood, 436 S.W.2d 324 (Tex.1968). This question is determined as a matter of appellate judgment in the light of the record as a whole. Texas Sand Company v. Shield, 381 S.W.2d 48 (Tex.1964).

The application of the harmless error doctrine to improper jury argument presents the appellate court with one of its most difficult assignments. On the one hand, we are considering the effect of improper argument, which was usually deliberately made for the purpose of influencing or even prejudicing the jury. Yet on the other hand, we must satisfy ourselves from the record that such improper argument probably caused the rendition of an improper judgment. In most cases, it is impossible to understand the significance, if any, to the jury of such improper argument. In the final analysis, it would appear that only the trial court's prompt and firm control of argument as authorized by Rule 269(g), T.R.C.P., can effectively control harmless error brink-

manship in argument by skilled advocates. See Kollmorgan v. Scott, 447 S.W.2d 236 [Tex.Civ.App.—Houston (14th) 1969, no writ].

Here the evidence fully supports the findings of primary negligence. While a closer issue is presented as regards deceased's own conduct in view of the relatively slow backing speed of the defendant truck and the absence of any outcry by deceased, clearly the jury was justified in resolving the issues of contributory negligence against defendant. The damages were well within the evidence and demand of plaintiffs. There is no showing whatsoever that any discussion was had by the jury as to the effect of the answers upon the judgment to be rendered. After a careful analysis of the lengthy record before us, we cannot say that the improper arguments of plaintiffs' counsel, or the cumulative effect of same, was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in this case. Accordingly, defendant's points asserting improper jury argument are overruled.

■ Defendant asserts by its ninth point that plaintiffs' counsel implied in his voir dire examination of the jury panel that defendant was protected by liability insurance. Counsel made substantially the same general type inquiry as detailed in South Austin Drive-In Theatre v. Thomison, 421 S.W.2d 933 (Tex.Civ.App.—Austin 1967, writ ref'd n. r. e.). It was there held that such inquiry did not infer the existence of insurance in the case. We reach a similar result after a careful examination of the entire voir dire examination in this case. See also Kollmorgan v. Scott, supra.

■ Five points complain of the charge of the court. Errors are urged in the court's refusal to submit defendant's requested issues inquiring as to whether the traffic condition created by the one open lane on this busy highway was the sole proximate cause of the accident in question,

3. Cooper v. Argonaut Ins. Co., 430 S.W.2d 35 (Tex.Civ.App.—Dallas 1968, writ ref'd n. r. e.)

and whether deceased had voluntarily exposed himself to the perilous conditions created by such traffic arrangement. There is abundant evidence that a hazard was created by the fact that only one lane was open to traffic, and the dumper was required to stand in the limited space between the asphalt windrow and this open traffic lane. Defendant asserted and showed by expert testimony that it was possible for deceased to have been struck by a moving vehicle, and thus knocked under defendant's trailer. However, there was not a scintilla of evidence that this happened. The uncontroverted testimony of the disinterested witness, Franklin, is to the contrary. Defendant's witness, Gonzalez, did not see or hear a vehicle strike deceased. In the absence of any evidence to support a finding that deceased was struck by a vehicle in the moving traffic lane, the court did not err in refusing these requested issues.

■ The trial court properly limited the definition of unavoidable accident to "an event not proximately caused by the negligence of any party to it." Dallas Railway & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379 (Tex.1952); Miles-Sierra Company v. Castillo, 398 S.W.2d 948 (Tex. Civ.App.—San Antonio 1966, writ ref'd n. r. e.). Defendant's complaint that the form of the damage issue was on the weight of the evidence is without merit. The basic question, as well as each of the individual elements, were properly conditioned by the phrase "if any."

■ Defendant urges the court erred in overruling its objections to the charge because Issues 1–15 are double submissions of the same issues of negligence against its driver, Uribe. It is seen that five of the six submitted acts of negligence relate to two basic complaints—the failure of Uribe to keep a proper lookout, and his backing of the truck without direction by the dumper. Our appellate courts have repeatedly stated that only the controlling issues should be submitted, and various phases or shades

of the same issues should not be submitted. It has been particularly emphasized that the general issue of proper lookout should not be fragmentized. Rule 279, T.R.C.P.; Traywick v. Goodrich, 364 S.W.2d 190 (Tex.1963); Texas & Pacific Railway Company v. Snider, 159 Tex. 380, 321 S.W. 2d 280 (Tex.1959); Shaw Tank Cleaning Co. v. Texas Pipeline Co., 442 S.W.2d 851 (Tex.Civ.App.—Amarillo 1969, writ ref'd n. r. e.); Tuloma Gas Products Co. v. Lehmberg, 430 S.W.2d 281 (Tex.Civ.App. —San Antonio 1968, writ ref'd n. r. e.); Pope, Broad and Narrow Issues, 26 Tex. B.J. 921, 980 (1963). Here the court should have submitted the acts or omissions charged Uribe in three or four series of issues at most. However, we cannot say that this form of submission was reasonably calculated to and probably did cause the rendition of an improper judgment. Holmes v. J. C. Penney Co., 382 S.W.2d 472 (Tex.1964).

■ After the death of Lewis on November 21, 1967, his widow married and divorced James Hodge Lightfoot of Dallas. On September 4, 1969, she married James Dale Morton, and at the time of trial was living with him in Grapevine, Texas. Nevertheless, her trial petition, filed on February 16, 1970, was filed in the name of "Shirley K. Lewis, a feme sole." The trial court granted plaintiffs' motion in limine and instructed defendant not to show that the widow had remarried or might remarry, and to refer to her only as "Shirley K. Lewis." Defendant was permitted to interrogate the jury fully as to their acquaintanceship with Lightfoot and Morton, and to inform the panel that Shirley K. Lewis had lived both in Dallas and Grapevine.

Defendant complains on this appeal of the refusal of the trial court to permit the jury to know the true identity of Shirley K. Lewis. It concedes that the rule is well settled that the remarriage of a surviving spouse, or the possibility thereof, should not affect the damages recoverable for wrongful death of the deceased spouse;

and therefore, evidence of the surviving spouse's remarriage is not admissible for the purpose of mitigating damages. See J. A. Robinson Sons, Inc. v. Ellis, 412 S.W.2d 728 (Tex.Civ.App.—Amarillo 1967, writ ref'd n. r. e.); Texas Electric Ry. v. Stewart, 217 S.W. 1081 (Tex.Civ.App.—Dallas 1920, writ ref'd). If evidence of remarriage came before the jury, plaintiffs would have been entitled to a proper instruction of the above rule.

We do not believe it was proper for the trial court to permit and, by his instruction, to even aid plaintiff in misrepresenting her name and marital status to the jury. See In re Evett's Appeal, 392 S.W.2d 781 (Tex. Civ.App.—San Antonio 1965, writ ref'd). Nevertheless, prejudicial harm has not been shown by this evidence.[4] None of the jurors were shown to have any acquaintanceship whatsoever with Lightfoot or Morton, or the wife of either. Furthermore, it is seen that in her testimony, Mrs. Lewis admitted she had another husband. In response to a question regarding the heart condition of the father of deceased, she said, "His first attack happened the day that my first husband got, my husband got killed." This admission passed without apparent notice by either party.

■■ Reversible error is not shown by the trial court permitting plaintiffs' counsel to ask a leading question on redirect examination of Joe Lewis, where these facts had been previously testified to by this witness. Defendant was prevented from having Officer Johnston and Detective Toscano read certain statements made by Uribe and Gonzalez during the police investigation. Uribe said in part that the victim "apparently crossed beneath the trailer." He was a witness on behalf of defendant and frankly admitted that he did not see deceased go under the truck. Nor did Gonzalez or anyone else to his knowledge see a vehicle strike deceased. While we doubt that defendant's bill of exception was properly perfected, the trial court did

not err in refusing to admit these unsupported hearsay conclusions from the police report.

■■ Defendant's nineteenth point asserts improper conduct with a juror by an associate of plaintiffs' counsel. This young associate came to San Antonio from the Austin office to observe the oral arguments. At that time, he thought he recognized one of the jurors as a former law school secretary at the University of Texas. After the verdict was received and the jury discharged, the attorney talked briefly with this juror regarding this possible relationship. The uncontroverted testimony of both the young attorney and the juror is that she had never been secretary of the law school, and in fact, had never lived in Austin. No improper conduct is shown by this conversation *after* the jury was discharged.

■■ Jury misconduct is asserted by defendant's point that the juror, Mrs. Stainthorpe, failed to reveal that a member of her family had a death claim. Her husband's father was killed in a car-train wreck when the juror's husband was a small boy. A juror who worked for the railroad as a co-employee of the deceased Stainthorpe testified that a settlement must have been made, which would have included a claim on behalf of the young boy. There is no showing that Mrs. Stainthorpe had any knowledge of such claim, if any, which arose long prior to her marriage. In any event, it is difficult to conceive of how this incident resulted in harm to defendant. Childers v. Texas Employers' Ins. Ass'n, 154 Tex. 88, 273 S.W.2d 587 (Tex.1954).

■■ Defendant's twenty-third point complains that the amounts of damage as found by the jury are manifestly too large and unjust, and that the trial court erred in not granting a remittitur, so that the total judgment does not exceed $130,000. The jury awarded the surviving widow $120,000; the six month old son $50,000; and each of deceased's surviving parents

---

4. To find harm, we would have to presume the jury would disregard the appropriate instruction.

the sum of $5,000. Judgment was entered in these amounts plus the sum of $1,609.50, which was stipulated to be the amount of the necessary funeral expense. The widow and minor son's awards were reduced by the amount of the workmen's compensation death benefit heretofore paid by Intervenor, National Surety Company.

Lewis was 21 years old at the time of his death with a life expectancy of over 49 years, and was earning an average of $5,000 annually. An expert witness calculated that his anticipated earnings, based upon a 43 year work life expectancy, were approximately $296,000, which amounted to $225,000 when reduced to its present cash value. He had been married less than 18 months, but the uncontroverted evidence shows that he was a devoted family man, who was also very close to his parents. He worked with his father and three brothers, and this family spent Sundays and holidays together. Deceased helped his father on the latter's farm on his off days.

The applicable rule in considering the complaint of excessiveness was stated by this Court in Green v. Rudsenske, 320 S.W. 2d 228 (Tex.Civ.App.—San Antonio 1959, no writ) as follows: "The law is settled that before an appellate court will disturb a judgment rendered upon a jury verdict, on the grounds that such verdict is excessive, there must be circumstances tending to show that it was the result of passion, prejudice or other improper motive, or that the amount fixed was not the result of a deliberate and conscientious conviction in the minds of the jury and court, or so excessive as to shock a sense of justice in the minds of the appellate court."

Defendant points to nothing other than the size of the verdict to show any passion or prejudice on the part of the jury. After examination of such verdict in the light of the record, we cannot say that there is anything in any of the awards, or the total amount thereof, to demonstrate that the verdict was the product of passion, prejudice, or any other improper motive by the jury. The awards are well within the pleadings, the evidence and even the amounts suggested in argument by plaintiffs' counsel. Defendant's complaint that such damages are excessive is overruled.

■ Defendant urges by its final point that the cumulative effect of all errors was such as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case, so as to require a remand of the case under Rule 434, T.R.C.P. It is true, as detailed heretofore, that errors were committed in the trial of the case. This is not surprising, considering the length of the trial, which was hard fought by well prepared and skillful advocates on both sides. We have carefully considered such errors in the light of the lengthy record presented by this appeal. In the final analysis, we reach the same conclusion as set forth under defendant's eighth point. We cannot say that the procedural errors committed in this trial probably caused the rendition of an improper judgment. Accordingly, this point must be overruled.

The judgment is affirmed.